Your Honor is number 15-2135 and 16-1658 Mark Corban, et al. v. Sarepta Therapeutics, et al. Mr. Emmons? Yes, sir. Steward W. Emmons for the plaintiffs. I would like to reserve, let's make it three minutes, please. This is a securities class action lawsuit. It's another drug company case. This one's against Sarepta Therapeutics, Inc., two of its executive officers. We appeal three district court's orders here. The first one is the court's order denying plaintiff's motion for leave to amend. The second is the order denying the Rule 60B2 motion to vacate. And finally, the last one is the one-line minute order denying the Rule 5090 motion to reconsider. The determinative issue on this appeal, though, is whether any of the proposed amended complaints that go along with each of these motions, and each of these were based on newly discovered evidence, states a claim for relief. And now this is a question of law that is reviewed by this court de novo. And the allegations make clear that immediately prior to the class period, and this includes the meetings on March 13, 2013, and July 23, 2013, FDA expressed serious concerns and made significant requests to Sarepta concerning its Atemperson data. Now in Omnicare, the Supreme Court said that a statement of opinion is materially misleading if the issuer made the statement with the knowledge that the federal government was taking the opposite view. And the area it's holding, the recent First Circuit case, holds similarly. And that's the exact scenario that we have here. We have defendants making extremely positive statements while knowing, yet failing to disclose, any of FDA's significant concerns while failing to disclose that FDA was essentially taking the opposite view. But here, the defendants went further and they actually communicated to the market that FDA shared Sarepta's positive views. So as I understand it, the first and key, but not only, statement is the July 23 press release that you point us to. You mean the July 24 press release. After the July 23 meeting, the July 24. Well, there's misrepresentations and there's numerous misrepresentations in conference calls and press releases throughout the class period. The July 24th one just happened to be the first one, and that's the one that defendants talk about in their briefs. Let me ask you this. I think you've complained. We've got, what, four complaints, one of which is, what, 165 pages long or something? They're very long complaints. So, and you're supposed to be able to show us that you've got some facts that make a strong inference about Center, but you then want us to go through a 165-page complaint. Well, I doubt it. I'm sorry to do that, but the PSO, the LRI requires it. I mean, if you come up with some... Let me ask you this point. What's your best, what's your number one candidate for a statement made by the defendant that is violative, for which there's Center? Okay. Well, let me just pick out maybe two or three of them here. And here we go. Well, let me get a few of them. Okay. Well, your brief seems to focus on the July 24th press release about they were too rosy a description of the FDA meeting. Actually, our brief, we set forth a long list of false and misleading statements. Yes, you did. And they're on various dates throughout the class period. So I wouldn't say the focus is on the July 24th one. That's the one the defendants focus on where they talk about FDA said they're open to considering an NDA, and then they fail to say that in the very same sentence, FDA said that we have a, quote, number of concerns and required surreptitiously address these concerns. Am I correct that after they issued that press release? On July 24th? Yes. Their stock dropped. It did drop slightly, yes. So it's an unusual type of claim that you're saying that a press release that caused the company's stock to drop was insufficiently pessimistic. Well, let me tell you. What Sarepta was told by FDA immediately prior to the class period is that your immunofluorescence method for quantifying dystrophin is unreliable, and that the numbers you have, the actual numbers, are far less than what was presented. It is much lower than the... To take a period of time. You're now talking. It helps if you give us some markers so we know. I think you're talking about the prior to July 23rd time frame now. Okay. The key meetings are on March 13, 2013 and July 23rd, 2013. Right. Okay? And so... And so they poured lots of cold water prior to July 23, but on July 23, for the first time, they tell them that they are open to going down this road potentially, which is good news for the company, but for the caveats and the way the company describes it caused the stock to drop. Well, when the only partial part of the truth came out in November 2013, the stock dropped 64%. And the reasons that FDA said that the NDA was premature on November 12, 2013, those were the exact same concerns that FDA expressed on March 13. Well, let me ask you about that because when I read the FDA pronouncement for November, which you're pointing to, it referred to recent events. Well, it's... It's precipitating the FDA position, so how do you ask us to assume that the FDA was simply saying that for the very same reasons that were in effect on July 23rd and nothing has changed, we're now announcing to the world? It seems to say just the opposite. Well, prior to the class period, well, okay, the FDA didn't tell Sarepta that they're open to considering an NDA. In the very same sentence, the defendants take this one part, they truncate it, and they tell them a misleading half-truth. And that was good news? Well, if you look at just how they're considering an NDA, investors thought it was good news, but that's because they weren't told the rest of the story. Well, they came with caveats, and they disclosed some of the caveats, but you're saying they didn't disclose them fully and accurately enough, or else the stock would have dropped even more than it would. It absolutely would have dropped, as is evident by November 11. Their caveats, by the way, were not informative at all. They were either generic, or they said that FDA had requested some information from data that Sarepta already had and could produce, and did not say that FDA had conditioned up-filing on Sarepta addressing, quote, a number of concerns, and those concerns were getting confirmation of your district and data, which FDA thought was biased from an independent laboratory. And that means going out and doing new analysis in new data. They also told, FDA also told Sarepta that they needed to do a Western law analysis. And the reason that FDA told Sarepta this is because FDA had flatly told Sarepta that your destrophin data is not reliable. The immunofluorescence method that you use does not adequately quantify data, and so basically all the dystrophin data you produce is really not worth much because we think it's unreliable and uninterpretable. And this doesn't even talk about what Sarepta said about the clinical benefits and how badly that contradicted as well what FDA had just told Sarepta. And I can go through a few of these real quick and give you some examples. But here's a statement that they made, okay? So, and this one actually is on August 15th, 2013. And this is after the meeting prior to the class period. FDA had told Sarepta all this about their dystrophin data. So Sarepta says, quote, we shared a lot of this with FDA, and they're talking about the dystrophin data. And I think they understand the methodology. This was not something that was questioned or challenged in terms of our method of quantifying. And what had FDA told Sarepta? Your method of quantifying is unreliable, and your data is really not interpretable. So then they doubled down. They doubled down on September 9th when Sarepta says to the market, FDA's request for additional information, quote, is not an indication of the lack of strength of our current biopsy analyses and data, end quote. These were the three biopsies that FDA said were unreliable and they were the only ones available at the time, and there was not a new one until week 180, and that's in 2015. And so they basically said that, no, FDA is great with our data here. These are false statements. These are objectively outright false. And what they further indicate, and this is important for CNR, the fact that they're making these statements indicates that, no, Sarepta was not trying to inform investors, as the district court erroneously found, whether what Sarepta was doing was actively trying to mislead. And defendants don't even, I'm not sure what you want to talk about, but defendants don't even question that they had a knowledge of the serious concerns both for the district court and for the clinical data, by the way, which Sarepta had been told by FDA prior to the class period, that your clinical, your comparison study 202, that's their study, provides no interpretable evidence of benefit, end quote, and they said, this is not even, this is, quote, unreasonable, even for hypothesis generation, end quote. So the trial was not even any good for the clinical aspects, even to come up with hypotheses. And defendants don't deny that they knew all this, and they can't. Garabedini County, the two individuals, they attended both the March 13th, both March 13th and, my mouth's getting dry, July 23rd, 2013 meetings. Their names are plastered right there on the meeting minutes. Now, to the court's credit, she did recognize, she did recognize that these were voluntarily false and misleading statements, and so what she says is, quote, defendants, Thank you, you have your reserved time. Okay, thank you very much. Thank you, Your Honor. Chris Green on behalf of Sarepta Therapeutics and the defendants. I'd like to start with the July 24th press release. Judge Kayaba, as you noted, far from extremely positive, it was subdued, measured, and, in fact, net, net negative. And the stock did indeed drop double digits, 16%, following the release of this information and in the conference calls and thereafter the stock continued to rest in a below pre-July 24th state. The reason for that is when you go through the press release, the caveats are critical and very negative. To be sure, and I'd like to go through six of them, just tick six of them off. The first is that, to be sure, we thought it was good news that the FDA was finally open to considering an NDA on an accelerated approval basis based on dystrophin as a surrogate endpoint, as opposed to having to do clinical trials for another several years, as is the normal course. But we said they're only open to considering it. We didn't say anything further than that, and, of course, we quoted the FDA directly to make sure, frankly, that we wouldn't be in the situation where the accuracy was being questioned. We then say, but it's going to take us a year. It's not like the FDA said, hey, based on the data we've got right now on dystrophin, we're good, you might as well file it. We actually had a year's worth of work to do, and we told the market that. We said the FDA wants additional information, verification, and dystrophin quantification, and I want to read this because it is the very first caveat that we make immediately following saying that the FDA was open to considering an NDA. They say the FDA stated in pre-meeting comments that the agency is, quote, open to considering an NDA based on these data for filing, end quote. The agency, however, requested additional information related to the methodology and verification of dystrophin quantification. Did the FDA request, were they actually as a, you know, one of the things I did is I had my clerk take all of your client statements and then all of the FDA statements and line them up, and your client statements are certainly, I think, a little bit rosier view in tone as you have the description, but if you bear into the facts this particular point on methodology and verification, is it fair to view all of the FDA requests as limited to methodology and verification? Yes. Judge Talwani noted two of the statements. There were two statements that she ultimately found in the fourth iteration of this that were, she believed, were misstatements. One of them, there's only one statement that was made in the ADCOM meeting minutes or in a briefing document two or three years later that relates to something that Sarepta was allegedly told in July 2013. That statement is the following. As early as the July 23, 2013 meeting, FDA expressed concern that all muscle biopsies were obtained and processed by a single technician at a single study center, and that in part, because of this concern about bias, we also ask that you confirm by an independent laboratory. That's what we're talking about when we say verification. So I'm about the requirement to get additional biopsies and to what there's a requirement also on the, they wanted additional biopsies for all the study 202 patients and they wanted the west and broad analysis of all the existing biopsies. So that was still in flux and under negotiation as of the time of our press release in July, which is exactly why we said that we need to come to an agreement with the FDA about what's going to be required in terms of the quantification and verification. We then get the minutes, which are given to us in August, and in September at a health care conference to the same analyst that all of the conference calls to the market are with, the CEO actually ticks off exactly these. So I'm now in a September 9th health care conference, and one of the analysts, there's seven or eight analysts who follow the company, one of the analysts says, so maybe since everyone's focused on the accelerated approval, have you gotten the FDA meeting minutes back and is there anything new in there that we should be aware of? The CEO responds, yes, we communicated the day after the FDA meeting took place where it was very clear that they were open to considering an NDA filing, so that's when we communicated that detail in July. He goes on, we did get our meeting minutes, that came about a month later, and it was very consistent to what we had communicated. At the time we communicated that the FDA wanted additional information on our district and methodology and data on verifying the district and quantification. We now have more clarity on that. He then ticks through three additional requests that they have made in the meeting minutes that were very much in flux at the time of that meeting, and that is where we say we need an independent reviewer or some kind of verification on the data that already exists. We're going to have additional biopsy samples, and he says the other thing they asked us to explore, they didn't tell us this is a requirement for an NDA filing, but they asked us to explore the idea of a fourth biopsy. We explained to them that this could be difficult, given that we would need to get approvals and amend the extension for a fourth biopsy of the 12 patients, and we also indicated that we might not be able to get support from the patients themselves for the boys to go into surgery a fourth time. We were concerned at that point that if we had to do that, that's putting these kids under anesthesia again, general anesthesia, cutting out more muscle. That is a significant thing to do, and what we were negotiating with the FDA at that point was, can we get the independent verification or some other, can we get you over the hump on the district and quantification in some way that's less invasive? You wanted a different marker. Sorry? You wanted a different marker rather than doing a biopsy to get the, so the appearance of the other marker would, in your opinion, would be enough. Right. We said, look, we've got the data on these 10 kids, and if what you want to do is instead of having us tell you how we read them, if you want an independent verification, or we'll submit them directly to you for you to review, which we did, which we ultimately did. Let's do it that way instead of having a fourth biopsy. Let's work on that. That was all in flux, and that's exactly what ObvioMed stands for, which is company sponsors who are trying to work through this process, especially in this context where we're seeking, where we're totally in uncharted territory and we're seeking accelerated approval on an unmet disease and we're relying on uncertain standards and totally unclear guidance on what we're going to have to meet, there needs to be room for back and forth with the FDA on this. That's what ObvioMed stands for, and this is exactly what we're saying. Critically, after we relayed all this to the market, the stock didn't move at all. And the reason for that, they treat this as if there were some kind of bombs here or some kind of safety adverse events or those kinds of things that are typically held back in these kinds of cases. These are not bombs. This is normal back and forth and totally subsumed within the July press release. We covered this ground with our investors, and we told them there was a lot of wood to chop here, a lot of work to do, and it's going to take a year. We don't know exactly what work they're going to make us do, but it is obvious that our current presentation of the dystrophin is not enough. That's why we have to keep getting them over the hump. That's what we told them on July 24th. When we got more detail, we told them that in September the stock did not move at all. When the stock did move, it was precipitated by a subsequent FDA announcement. Did that follow on the heels of another drugs failure? That's absolutely right. Absolutely right. So we give out the July press release. We get through July and August and September. We relay the additional clarity the FDA has provided, and the stock just hovers around. We've got the stock chart. It just hovers around at the same price. Then GSK announces that they've got a competitor drug with some similarities, some differences to be sure, but some similarities. The FDA stops that one in its tracks. Interestingly, and I'm going to veer for a second here, at first the investors thought that was good because it was removing a competitor. So the stock spikes up, but then they thought, wait a minute, that might be bad news for this drug as well. So the stock drops. But the FDA said it was because of those recent events that they now think, hey, wait a minute, maybe dystrophin isn't so good anyway. When it says recent events, you use the word those recent events. Correct. Recent developments in a competitor's drug trial. The FDA says that. So the FDA says that's what it is that is causing us to say, not that there's some new bomb we're going to say, but, hey, we told you in July that we were open to considering an NDA on the basis of dystrophin. That might be premature. We need to learn more about this. And we disclose that to the market. We had told them they were open to considering it. So we told them in November. Now they're dialing that back a little bit and saying, hey, it's premature. Ultimately, of course, we were right. We were exactly right. And, Judge Chiodo, you mentioned that this is an odd case. We had a negative press release, and what we said in it came to pass. The FDA indeed considered the NDA, indeed accepted it, and it was approved on an accelerated approval basis without having to do a placebo-controlled clinical study, which is what we were telling them in July of 2013. That's what we told them. So when you back up from all that, I don't think there's a misstatement, let alone a material one, and we're nowhere near on CNTR. Nowhere near it. There's nothing on CNTR. No stock sales. The opposite. The number two executive at the company, knowing everything that was going on, all the details with the FDA at the time, he bought 5,000 shares. Is it alleged in the complaint that that individual knew everything? I thought there was an argument in the appendix brief that we could assume, or for purposes of evaluating the complaint, we can't assume that he knew everything. He's the number two individual at the company. So they argue that the number one individual and the number three individual knew, but not the number two. I would say the executives at the company know what's happening with the FDA on the one drug that might potentially generate revenue at the company. As to that question, how big a company was it at that time? How many people were working for it at the level? At the executive level? Yeah. Three or four? Yeah. It's the CEO, the CFO, and the chief scientific officer. And the general counsel. I put the general counsel in there because he's here. He's in the executive suite. But those are the individuals who know. And he's out buying over $150,000 worth of stock. There's no stock sales. And it's as a matter of law, a general corporate offering in every circuit, and certainly in this one, has been deemed insufficient as a matter of law to establish scienter. It is particularly the case here where we have an at-the-market offering. So it's not a one-burst offering where you're going to get an influx of cash all at one time. At-the-market offering is a we're in no rush. They tell the brokers to sell stock when there's sufficient demand for it. Sometimes these things take months. In fact, they always take months. Sometimes they take six to 12 months. This one took three months. It ended at the end of September. It started before the class period and ended at the end of September. It is facially insufficient on what we have here to have scienter. So with that, unless there are any further questions, I'll conclude my argument. Thank you, Your Honor. Thank you. Mr. Edmonds, you had reserved some time. Okay. Okay, first of all, the stock dropped 16% in July 24th because at that time the market had been primed to expect FDA to say we will accept DistroPen as a surrogate for accelerated approval. Now, the fact of the matter is that defendants never, not once, disclosed any of the FDA's concerns. And that's the central reason why this case is distinguishable from a Biomed, is because a Biomed actually did disclose FDA's concerns. Now, if you look at the 64% stock drop in November, and we have a chart, it's on A809-11, and it's a chart that compares the reasons that FDA found the NDA premature in November, the concerns that prompted FDA to do this with the concerns that was expressed by FDA to Sarepta prior to the class period, they are practically identical. No interpretable clinical benefit. That hurts you when you're trying to say it's reasonably likely to predict a clinical benefit. No unreliable DistroPen data, and again, FDA made the emphatic request that Sarepta conduct a placebo-controlled trial in order to get interpretable results. Well, the fact of the matter is they didn't want to do a placebo-controlled trial, because they knew it would probably be a bust, and really the motive here was to gin up public and political support for FDA to approve it, which they did, which Janet Woodcock did, over the objections of the entire review team. Nobody thought the data was any good. Do you want us to second-guess that this drug was approved by the FDA? Do you want us to second-guess the FDA? Well, it was approved three years after the class period, and the fact that it was approved by FDA didn't change the fact that investors were misled and damaged. I think I just hear you saying we should discount that because it was a result of political pressure. Are we able to do that? Well, they approved it, there's no doubt, but it does not change the fact that defendants misrepresented the data during the class period and misrepresented FDA's view, and on November 12, 2013, when some of this came out, the stock dropped like a rock, 64%. If they'd said that in July, we wouldn't have seen a 16% drop. We wouldn't have seen the market value and all of these concerns, we would have seen something that was more like 60%. No, but Janet Woodcock didn't even rely on this data to approve the tablets, and all the data she relied on was new. It came out in 2015 and 2016, and she specifically said, I didn't rely on the three biopsies because they were unreliable. So I guess I'll have to conclude with that. I will just say that the FDA found the defendants exhibited serious irresponsibility in publishing selected data to the market. They said that this was misleading. FDA said this in the review papers. The fact of the matter, if you read the complaint, it reads- Excuse me, I think your time's elapsed. Okay, so I just ask to reverse the lower court's order and allow me to remain for further proceedings. Thank you very much.